**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| KEITH M. LAGARDE On Behalf of Himself and All Others Similarly Situated, ) ) ) | |
| Plaintiffs, ) | Case No. _____ |
| v. ) ) | **CLASS ACTION COMPLAINT FOR** |
| CYTEC INDUSTRIES INC., SHANE D. ) FLEMING, WILLIAM P. POWELL, ) ANTHONY G. FERNANDES, CHRIS A. ) DAVIS, RAYMOND P. SHARPE, LOUIS ) L. HOYNES JR., BARRY C. JOHNSON ) PH.D., THOMAS W. RABAUT, CAROL ) P. LOWE,  and DAVID P. HESS.. ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Keith M. LaGarde ("Plaintiff"), through his undersigned counsel, alleges upon

personal knowledge with respect to himself, and upon information and belief based upon, *inter*

*alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This is a class action is brought by Plaintiff  on behalf of himself and the other the

public stockholders of Cytec Industries Inc. ("Cytec" or the "Company")(other than Defendants

defined below) against the Company and its Board of Directors (the "Board" or the "Individual

Defendants"), in connection with the execution of an Agreement and Plan of Merger (the

"Merger Agreement") on July 28, 2015 with Solvay SA ("Solvay" or "Parent"), pursuant to

which Solvay's wholly-owned subsidiary, Tulip Acquisition Inc. ("Tulip" or "Merger Sub") will

merge with and into Cytec, with Cytec surviving as a wholly-owned subsidiary of Solvay (the

"Proposed Transaction" or "Merger").   Pursuant to the Merger Agreement, the Company's common stock will be cancelled and converted into the right to receive $75.25 in cash without interest (the "Merger Consideration").   The Proposed Transaction's total value is $5.5 billion and is expected to close in the fourth calendar quarter of 2015.   Plaintiff asserts claims   against Cytec and the Individual Defendants for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act")(15 U.S,C. §§78n(a), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9).

2.      Although Cytec touts that the Merger Consideration represents a 28.9% premium to its closing price on the day prior to the Merger Agreement and a 26.9% premium to its volume weighted average stock price for the last three months, the Merger Consideration fails to reflect the stock's intrinsic value in light of the Company's prospects for future growth and earnings. Quite simply, the Company is a leading producer of composite materials in the aerospace industry and key supplier of such materials for the Airbus 350 and Boeing 787.   These materials also are seen as a critical component going forward in the auto industry.   As it was solidifying its position in this industry, Cytec's stock had been trading over $62 per share in the months prior to the announced Merger based on stellar earnings reports ($2 billion in fiscal 2014).

3.      Solvay   certainly   recognized   this   value.     Indeed,   in   connection   with   the announcement of the Proposed Transaction, Solvay stated that the acquisition of Cytec will make it a leading company in the market for composite materials in aerospace (with expected 10% annual growth for Solvay), and will boost its business for producing chemicals for the mining sector.   Solvay's Chief Executive Officer ("CEO") noted in an interview with CNBC:

> We do believe that getting a position in aerospace – it's the second global supplier of advanced material into aerospace – is very attractive for a company like us.[1]

4.      Unsurprisingly, in view of Cytec's strong performance and long-term prospects, numerous hedge funds' and other institutional investors' aggregate holdings increased to over $323 million during the first quarter 2015, up from $257 million the previous quarter.[2]

5.      Cytec's recent operations, stock performance and the value of this acquisition to Solvay's business should have commanded consideration far greater than the Merger Consideration

6.      Rather than negotiating a merger consideration that reflects that above, the Defendants engaged in a process that ensured the Proposed Transaction with Solvay.  For example, a competing bidder that proposed a higher consideration was rushed out of the process, and certain Individual Defendants stand to receive a financial windfall they would not otherwise enjoy absent the Merger as they cash out numerous illiquid holdings in Cytec, such as options and restricted stock units.[3]

7.      Defendants now ask Cytec stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Form PREM14A Proxy Statement (the "Proxy") filed with the United States Securities and

---

[1]      http://www.insidermonkey.com/blog/hedge-funds-cash-in-as-cytec-industries-inc-cyt-sold-to-solvay-for-5-5-billion-364414/.

[2]      On July 31, 2015, T. Rowe Price Associates, Inc. acquired a new 11.5% position in the Company's common stock.  SEC filings show 236 hedge funds and institutional investors own Cytec. The institutional ownership of the company in the first quarter 2015 is high, at 85.62% of the shares outstanding.

[3]      Defendant Fleming, Cytec's Chief Executive Officer and Chairman of the Board of Directors, alone owns over 1 million shares of the Company's common stock in the form of options, deferred stock shares, and other ownership interests. http://www.sec.gov/Archives/edgar/data/912513/000119312515080488/d851272ddef14a.htm.

Exchange Commission ("SEC")[4] in violation of Sections 14(a) and 20(a) of the Exchange Act. The Proxy contains incomplete and materially  misleading information regarding the process leading to the consummation of the Merger Agreement, including: (i) the analysis concerning the Individual Defendants' decisions regarding alternative strategic transactions considered by Cytec, and (ii) the financial analyses conducted by J.P. Morgan Securities LLC ("J.P. Morgan"), financial advisor to Cytec.

8.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Cytec stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act..

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

10.      Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.  The Individual Defendants have also agreed to submit to the jurisdiction of this Court pursuant to a

---

[4] The initial preliminary Proxy was filed on August 28, 2015 and was amended on October 2, 2015.

January 30, 2014 amendment to the By-Laws of the Company, which designated this Court as the sole and exclusive federal forum for adjudication of actions of this nature.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Cytec is incorporated in this District.   Venue is also proper in this District pursuant to a January 30, 2014 amendment to the By-Laws of the Company, which designated this Court as the sole and exclusive federal forum for adjudication of actions of this nature.

## PARTIES

12.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Cytec common stock.

13.     Cytec Industries Inc. (previously defined as "Cytec") is a corporation organized and existing under the laws of the State of Delaware with its principal executive offices located at Five Garret Mountain Plaza, Woodland Park, NJ 07424.   As outlined below in greater detail, Cytec is a specialty chemicals and materials company.   Cytec's common stock is publicly traded on the New York Stock Exchange under the ticker symbol "CYT."

14.     Defendant Shane D. Fleming has served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") since January 1, 2009 and as its President since July 27, 2008.

15.     Defendant William P. Powell has served as a director of the Company since December 1993 and as its Lead Director since April 2013.

16.     Defendant Chris A. Davis has served as a director of the Company since April 2000.

17.     Defendant Anthony G. Fernandes has served as a director of the Company since

July 2002.

18.    Defendant Raymond P. Sharpe has served as a director of the Company since April 2005.

19.    Defendant Louis L. Hoynes Jr. has served as a director of the Company since December 1994.

20.    Defendant Barry C. Johnson has served as a director of the Company since August 2003.

21.    Defendant Thomas W. Rabaut has served as a director of the Company since February 2007.

22.    Defendant Carol P. Lowe has served as a director of the Company since October 2007.

23.    Defendant David P. Hess has served as a director of the Company since April 2014.

24.    Defendants Fleming, Powell, Fernandes, Davis, Sharpe, Hoynes, Johnson, Rabaut, Lowe, and Hess form the Board of Directors of Cytec and are collectively referred to herein as the "Board" or the "Individual Defendants."

25.    Each of the Individual Defendants at all relevant times had the power to control and direct Cytec to engage in the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Cytec (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27.     This action is properly maintainable as a class action.

28.     The Class is so numerous that joinder of all members is impracticable.  As of July 24, 2015, there were approximately 71,463,330 shares of Cytec common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

29.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

30.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

31.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

32.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on

behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**A.    Background of the Company**

33.    Cytec is a specialty materials and chemicals company. The company operates throughout the world and is organized into four segments: Aerospace Materials, Industrial Materials, In Process Separation, and Additive Technologies.  The Aerospace Materials segment includes advanced composites, carbon fiber, and structural film adhesives. The Industrial Materials segment includes structural composite materials, which serve automotive, motorsports, recreation, tooling, and other structural materials markets; and process materials, which serves aerospace, wind energy, and other process materials markets. The In Process Separation segment includes mining chemicals and phosphines. Finally, the Additive Technologies segment includes polymer additives, specialty additives, and formulated resins.

34.    Cytec is a large, deep-rooted manufacturer working in industries with a high barrier to entry.   The composite fiber industry is a challenging one, but one in which Cytec has made great strides.  As reported by Plastic News in August 2014:

> Cutting weight from cars is important, as automakers push to hit Corporate Average Fuel Economy standards of more than 54.5 mpg by 2025.
>
> * * *
>
> The problem boils down to high cost and slow processing times, according to industry officials at JEC Americas, a composites trade show held in mid-May in Atlanta.
>
> According to a sampling of people at the trade show, carbon fiber for automotive costs $10 to $12 a pound, compared to less than a buck for steel.
>
> * * *

But if every automaker had a high-volume car using the advanced materials, the current carbon fiber industry could not make enough material, experts said at JEC Americas.

* * *

Relatively slow manufacturing is the other part of the roadblock for carbon fiber — as well as for traditional glass-fiber reinforced composites. To get into high-volume automotive, composites has to move past a craft-type of handwork to more-automated mass production, industry officials say.

* * *

Cytec . . . dramatically reduced cycle time. Cytec developed a rapid-cure vinyl ester resin system, MTM 23, for compression molding the battery enclosures. That material allows Continental Structural Plastics to mold the parts in less 10 minutes at a 150° Fahrenheit cure, but Cytec said MTM 23 could be rapid-cured in less than three minutes.

The process uses automation to make the enclosures, including a computerized layup pattern, automatic die cutting and laser alignment of patterns.

35.     Cytec has put forth much effort to achieve its strategic position, as explained in just one example in its 2013 10-K:

We began construction on a new standard modulus carbon fiber line in South Carolina in early 2008. On completion, the new production line will double our capacity for PAN carbon fiber. In the first quarter of 2009, we decided to delay the completion of the carbon fiber expansion project due to recession-driven demand reductions. Since then, carbon fiber demands have significantly increased, and we restarted the project in 2012. We expect the project to cost $324.0 on completion, of which $272.2 has been spent as of December 31, 2013, and expect the project to be complete and qualified for aerospace applications **in 2016.** (Emphasis added.)

36.     As referenced above, despite this high barrier to entry and competitive landscape, Cytec has experienced several quarters of strong financial results, exceptional growth in its two key segments, Aerospace and In Process Separation, and analysts view the Company's future prospects positively.

37.     For example, on July 17, 2014, the Company announced a 100% increase in its quarterly cash dividend, from $0.125 to $0.25 per share, and declared a two-for-one split of the Company's common stock, the second since it went public.  On October 16, 2014, the Company announced (1) net earnings attributable to Cytec for the third quarter of 2014 of $53.6 million, or $0.73 per diluted share; (2) approval by the Board of a new $200 million share repurchase program of the Company's common stock; and (3) the declaration of a regular quarterly cash dividend of $0.125 per share (having now given effect to the two-for-one stock split).

38.     Then, on November 5, 2014, Cytec announced (1) the commencement of a tender offer for any and all of its outstanding 6.0% Notes due 2015, which had a total principal amount outstanding of $141,759,000; (2) that it was calling all remaining such notes for redemption on December 5, 2014, to the extent they were not otherwise tendered and accepted pursuant to the tender offer; and (3) that it was also calling $82 million of its 8.95% Notes due 2017 for redemption on December 5, 2014.

39.     On January 27, 2015, the Company announced  (1) a net loss attributable to Cytec for the fourth quarter of 2014 of $29.3 million, or $0.41 per diluted share; (2) net earnings attributable to Cytec for the full year ended December 31, 2014 of $153.8 million, or $2.09 per diluted share; and (3) the declaration of a regular quarterly cash dividend of $0.125 per share.  In connection with these results, Defendant Fleming noted:

> Our fourth quarter results reflect a solid end to the year, with adjusted EPS up 14% versus the prior year quarter. On an annual basis, the company grew revenues by 4%, driven by volume growth and price increases from In Process Separation, Industrial Materials and Aerospace Materials, our core growth platforms, which was partially offset by 1% due to the divestiture of the Industrial Materials distribution product line in 2013. I am also pleased with the earnings improvement in 2014. We delivered 13% earnings growth from continuing operations over 2013 and 23% EPS growth, both on an as-adjusted basis.

40.     And, on April 16, 2015, the Company announced (1) net earnings for the first quarter of 2015 of $42.5 million, or $0.58 per diluted share; (2) net sales of $515 million; and (3) the declaration of another regular quarterly cash dividend of $0.125 per share.  Aerospace and In Process Separation sales increased by 7% and 12%, respectively, from the first quarter 2014.  In connection with these results, Defendant Fleming stated:

> Our first quarter results reflect a solid start to the year, with adjusted EPS up 15% versus the prior year quarter. Aerospace Materials delivered excellent results due to volume growth in both commercial transport and military sectors, and the In Process Separation segment also performed very well driven by strong demand for our specialty mining products. Both businesses translated the higher volumes into increased operating margins for the quarter. Overall, I am pleased with our results as we continue to execute our growth strategy.

41.     Defendant Fleming also reported a strong outlook for 2015 during the conference call to discuss the first quarter results:

> We continue to see steady demand growth in the Aerospace market led by large commercial transport with business regional jets and military contributing to the growth. In addition, we are starting to benefit from our productivity initiatives which are supporting higher operating margins this year.
>
> Based on the combined factors of steady demand, good order visibility and improved operating performance in the segment we are raising full-year guidance for Aerospace Materials. Annual sales are now forecasted in a range between $1.040 billion and $1.080 billion which represents about 6% top-line growth. Operating earnings are now estimated in a range between $200 million and $210 million representing about 15% earnings growth versus 2014.
>
> In the Industrial Materials business we enjoyed great growth in 2014 as a result of strong demand from two key markets: high-performance automotive and aerospace tooling. As I've mentioned in the past, tooling market demand tends to be uneven and we do not expect the same strong order patterns in 2014.

42.     Finally, on July 16, 2015, just days before the announcement of the Merger Agreement, Cytec announced (1) net earnings of $54.7 million, or $0.75 per diluted share; (2) net sales of $508 million; (3) earnings from continuing operations of $56.2 million; and (4) the declaration of a regular quarterly cash dividend of $0.125 per share.   Aerospace and In Process Separation sales increased by 1% and 6%, respectively, from the second quarter 2014.   In connection with these results, Defendant Fleming stated:

> Our second quarter results were in line with our expectations as we continue to execute our long-term plan. I am very pleased with the performance of our largest segments, Aerospace Materials and In Process Separation, both of which supported the solid earnings performance in the quarter against tough comparable quarters. Industrial Materials is experiencing weaker market conditions versus the prior year period, but we remain excited about the longer-term growth opportunities in the segment. Our solid performance through the first six months of the year gives me confidence in delivering our full year targets for the company.

**B.     The Flawed Process Leading to the Proposed Transaction**

43.     As described in the Proxy, on August 10, 2014, at the urging of one of Cytec's customers, Defendant Fleming contacted a representative of Party A and, over the course of the subsequent eleven months, representatives of the Company and Party A discussed the possibility of a business combination or a strategic collaboration between the companies.

44.     During these discussions, on December 19, 2014, the Board formed a Transaction Committee, which was comprised of Defendants Fernandes, Hoynes, and Powell, to assist the Board in reviewing and supervising the discussions with Party A and the Company's consideration of other potential strategic alternatives. The Company also retained J.P. Morgan and Sullivan & Cromwell LLP ("Sullivan Cromwell") to serve as financial advisor and legal counsel, respectively, to both the Transaction Committee and the larger Board in connection with this process.   Importantly, the Transaction Committee did not retain independent financial or

legal counsel of its own.

45.     On or about June 15, 2015, after several rounds of disappointing oral and written proposals from Party A, Defendant Fleming – who was ostensibly running the external process, despite not bring a member of the Transaction Committee – communicated to a representative of Party A that Party A would not be given access to management presentations and operational due diligence unless Party A would agree to undertake certain remedial actions necessary to obtain regulatory approval.  On June 16, 2015, a representative of Party A sent Defendant Fleming a letter stating that Party A was unwilling to agree to undertake all of the remedial actions requested by the Company.  Accordingly, the Company and Party A agreed to end further discussions regarding a combination of the two entities and agreed to continue discussions regarding potential collaboration opportunities.

46.     Just prior to this time, in early June 2015, Emmanuel Butstraen, President of Solvay Novecare, suggested to Defendant Fleming that he meet with the CEO of Solvay, Jen-Pierre Clamadieu.  On June 16, 2015, Defendant Fleming met with Mr. Clamadieu.  During this meeting, Mr. Clamadieu proposed that Solvay acquire Cytec for $72.00 per share in cash.

47.     On the following day, during a meeting with the Transaction Committee, Defendant Fleming updated the Transaction Committee regarding this offer. The Transaction Committee then discussed with representatives of Company management and J.P. Morgan various parties that might be interested in acquiring the Company. Ultimately, the Transaction Committee determined not to contact any financial sponsors, but instructed Company management and J.P. Morgan to identify and reach out on a confidential basis to representatives of a small group of companies that, in the judgment of Company management after consultation with J.P. Morgan and the Transaction Committee, were most likely to be interested in acquiring

the Company and to have the resources and financial wherewithal to do so expeditiously at a price that would be competitive with Solvay's $72.00 per share price. Importantly, while the Transaction Committee considered approximately ten companies that might be interested and capable of acquiring the Company, it only preliminarily suggested that J.P. Morgan contact Party B, Party C, and Party D, but then abdicated its responsibility by indicating that management should work with J.P. Morgan to assess whether these companies met the Transaction Committee's criteria and whether any other companies should be included in the Company's outreach effort.

48.     Thereafter, J.P. Morgan contacted representatives of Party B and Party D to gauge their interest in exploring a potential transaction with the Company.  A representative of Party B, which had previously requested that the Company contact Party B if the Company explored the possibility of a sale of the Company, informed J.P. Morgan that Party B would not be willing to make a proposal to acquire the Company.  Party D previously had expressed interest in acquiring the Company as well, but a representative of Party D indicated to J.P. Morgan that Party D would not be in a position to provide an initial indication of interest and would not commit to perform material due diligence on the Company unless the Company offered assurances to Party D that the process would remain open for three or four months.  Importantly, J.P. Morgan did not contact Party C, even though it had been identified as a potential party to contact by the Transaction Committee, based on guidance from Company management.

49.     The Board was informed of these contacts during a June 22, 2015 Board meeting. Thereafter, the Board authorized Defendant Fleming to call Mr. Clamadieu to indicate that, although the price offered by Solvay was not sufficient to complete a transaction, it was sufficient to permit Solvay to proceed in its evaluation of a potential transaction, including

14

participation in management presentations and due diligence.   The Board also directed J.P. Morgan to contact representatives of Party D to invite Party D to participate in management presentations with a view to attempting to accelerate Party D's ability to provide the Company with an indication of interest to acquire the Company.

50.     However, after representatives of J.P. Morgan contacted representatives of Party D to invite Party D to participate in management presentations, Party D declined to participate in management presentations or to otherwise move forward in the process given that the Company would not commit that the process would remain open for three to four months.   The Proxy is unclear as to why the Board was unwilling to afford this potential acquiror the time it needed to appropriately conduct due diligence on what would ultimately become a $5.5 billion transaction.

51.     On June 26, 2015, Solvay executed a non-disclosure and confidentiality agreement, and, on June 30, 2015, representatives of Solvay participated in management presentations delivered by Company management.

52.     Although the Transaction Committee had previously determined not to contact Party E, on June 26, 2015, J.P. Morgan reported to the Company that Party E might be interested in pursuing an acquisition of the Company and might be willing to commit time and resources to explore an acquisition of the Company.   The Proxy fails to disclose the basis for this changed belief or how J.P. Morgan came to be in possession of this information.     Nonetheless, representatives of Company management directed representatives of J.P. Morgan to contact Party E.   When representatives of J.P. Morgan contacted representatives of Party E, Party E expressed interest in exploring a possible acquisition of the Company.

53.     On July 1, 2015, Party E executed a non-disclosure and confidentiality agreement and representatives of Party E thereafter participated in management presentations delivered by

Company management.

54.     Also on July 1, 2015, Sullivan Cromwell informed legal counsel for Solvay that the Company expected that a "go shop" provision would be included in any draft of the merger agreement, and, on July 8, 2015, Sullivan Cromwell sent legal counsel for Solvay a list of key terms that the Company expected would be included in a draft merger agreement, which specifically included a 60-day "go shop" provision.  Nonetheless, on July 10, when legal counsel for Solvay returned a draft of the merger agreement to Sullivan Cromwell, the draft merger agreement did not include a "go shop" provision of any kind.

55.     On July 13, 2015, Mr. Clamadieu contacted Defendant Fleming to communicate a revised offer of $72.75 per share in cash for Cytec, which offer was subsequently confirmed in writing.  On the same day, Party E submitted a preliminary indication of interest of **$76.00 per share in cash** for Cytec and stated that it was "prepared, if given access to necessary due diligence, to reach a definitive agreement within 30 days."[5]

56.     On July 17, 2015, Defendant Fleming informed Mr. Clamadieu that, while Mr. Clamadieu should assume that $72.75 per share was still inadequate, the Company had instructed its legal counsel to respond with a merger agreement markup during the week of July 20, 2015. On the same day, Defendant Fleming also contacted a representative of Party E and informed him that Party E's request for 30 days to complete diligence was too long.

---

[5]     Following Party E's indication of interest, representatives of Company management noted that Party E's indication of interest was premised on an incorrect calculation of Cytec's outstanding equity interests, and that, adjusting for the actual number of outstanding equity interests, Party E's indication of interest actually had an implied value of approximately $75.25 per share in cash. Accordingly, representatives of J.P. Morgan informed representatives of Party E of the error, but Party E did not clarify its indicative price. According to the Proxy, "[a]bsent clarification, representatives of J.P. Morgan informed Party E that the Company would treat Party E as if its indication of interest were $76.00 per share."

57.     During the week of July 13, 2015, Company management held additional due diligence sessions with representatives of Party E and a representative of the Company provided a representative of Party E with an initial draft of a merger agreement.  During the week of July 20, 2015, representatives of J.P. Morgan repeatedly demanded that Party E move quickly.

58.     On July 21, 2015, Sullivan Cromwell sent a revised draft of the merger agreement to legal counsel for Solvay.  In this version, Cytec did not attempt to seek a "go shop" provision, but instead sought to secure a two-tiered termination fee.  Ultimately, the Merger Agreement would include neither a "go shop" provision nor a two-tiered termination fee.

59.     On July 23, 2015, during a meeting of the Board, the Board inexplicably concluded that management should notify Solvay about the Company's discussions with a viable alternative bidder – *i.e.,* Party E.  Later that afternoon, Defendant Fleming informed Mr. Clamadieu that the Company was engaging with another party and that the Company would need Solvay's best and final offer by July 30, 2015.

60.     This was s significant tactical blunder, as it caused Solvay to artificially accelerate the process and set a deadline for Cytec to accept its offer.  Specifically, just one day later, on July 24, 2015, Solvay communicated a revised offer of $75.00 per share in cash, but added the caveat that the offer would expire in its entirety at 5:00 p.m. EST on July 27, 2015 and that any transaction would have to be announced by the morning of July 28, 2015.  Mr. Clamadieu further noted that Solvay was unwilling to delay announcement any further, and that, should the Company fail to meet Solvay's deadline for an announcement on July 28, 2015, then Solvay would discontinue its negotiations with the Company.

61.     This posed a problem, as the Company, which had already been needlessly rushing Party E, despite its far superior proposal, had, on the morning of July 24, 2015,

demanded that Party E provide both its best and final offer as well as a markup of the draft merger agreement by July 30, 2015. **Interestingly, it does not appear that the Company immediately notified Party E of the now-accelerated timeline for it to provide its best and final offer by July 27, 2015 – the deadline set by Solvay for Cytec to accept its own offer.** To the contrary, the Company allowed Party E to continue to conduct due diligence from July 24 through July 26, 2015.

62.     Meanwhile, the Transaction Committee met on July 26, 2015 and decided that Defendant Fleming should contact Solvay to ask Solvay to increase its offer price and Party E to notify Party E that the Company would require Party E to demonstrate it was making substantial progress toward completing due diligence and marking-up the merger agreement on an expedited basis in order for Party E to remain viable.  Again, the Company does not appear to have immediately informed Party E that it would actually have to complete due diligence and provide its best and final offer by the following day – July 27, 2015.

63.     Later on July 26, 2015, Defendant Fleming contacted Mr. Clamadieu and stated that he would recommend Solvay's offer to the Board if Solvay increased its price to $75.25 per share and accepted the Company's position on two open points in the merger agreement. Defendant Fleming also informed Mr. Clamadieu that the Company was not prepared to meet Solvay's announcement deadline because the Company would require additional time to prepare a communications roll-out plan for its employees, customers and other stakeholders, but that, assuming Solvay met the Company's conditions, the Company would agree to negotiate exclusively with Solvay from the evening of July 27, 2015 through the signing of a merger agreement on the evening of July 28, 2015.  Later that day, Mr. Clamadieu informed Defendant Fleming that he would support an increase in Solvay's offer price to $75.25 per share and was

receptive to the Company's position on the two remaining merger agreement points.

64.     Also later on July 26, 2015, Defendant Fleming spoke with a representative of Party E and finally advised Party E that, in light of Solvay's offer, Party E would need to confirm its offer price by the very next day – July 27, 2015.  Unsurprisingly, the representative of Party E expressed concern about Party E's ability to meet the deadline and, later on July 26, 2015, Party E communicated to the Company through its financial advisors that it had been struggling to confirm value, would not be able to meet the deadline, and was withdrawing from the process.

65.     Having now reduced the process to but one bidder through an artificially interposed rush, on July 27, 2015, the Board met to consider Solvay's offer.  On the following day, the Board met again and approved the Merger Agreement, which was executed later in the day on July 28, 2015.

**C.     The Proposed Transaction**

66.     Despite the Company's prospects for long-term growth and success, and the superior proposal from Party E, on the morning of July 29, 2015, Cytec issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**Cytec Announces Merger Agreement with Solvay**

Woodland Park, NJ, July 29, 2015 - Cytec Industries Inc. (NYSE:CYT) announced today it has entered into a definitive merger agreement with Brussels-based Solvay. The total cash consideration will amount to US$5.5 billion, corresponding to an enterprise value of US$6.4 billion. The transaction price per share of $75.25 represents a premium of 28.9% compared to our closing price of $58.39 on July 28, 2015 and a premium of 26.9% compared to the volume weighted average closing share price over the last three months.

Shane Fleming, Chairman, President and Chief Executive Officer commented, "We are excited to be joining a preeminent global chemical company with leading market positions and a similar growth strategy to Cytec's. This union will enhance our businesses ability to drive their strategy of value creation through strengthening and leveraging our market

and technology leadership positions in
high growth end markets."

Jean-Pierre Clamadieu, CEO of Solvay, commented, "This merger marks
a major step toward Solvay's portfolio upgrade and enables us to
strengthen our technology offerings to include advanced materials
technology for the aerospace and automotive industries as well as
integration of Cytec's specialty chemical portfolio into our existing line of
advanced formulations. We look forward to working with
Cytec's excellent teams and to creating additional value for all our
stakeholders."

This acquisition is structured as a cash merger between Cytec and a
subsidiary of Solvay. The merger is subject to customary closing
conditions, including regulatory approvals and shareholder approvals. The
transaction is expected to close in the fourth quarter of 2015.

67. To the detriment of the Company's stockholders, the terms of the Merger
Agreement substantially favor Solvay and are calculated to unreasonably dissuade potential
bidders of the Company from making competing offers.

**D.    The Unfair Price**

68. Rather than permitting Cytec's shares to trade freely and allow its public
stockholders to reap the full benefits of the Company's increasingly positive financial prospects,
the Individual Defendants chose instead to sell Cytec to Solvay and cap the possible return for
stockholders for inadequate consideration.

69. The consideration offered to Cytec's public stockholders in the Proposed
Transaction is unfair and inadequate because, among other things, the intrinsic value of Cytec's
common stock is materially in excess of the amount offered for those securities in the Proposed
Transaction given the Company's prospects for future growth and earnings and the value Solvay
attributes to its future success based on the Merger.

70. The Company's recent success has been reflected in its favorable financial results
described above.

71.     Moreover, just prior to the announced Proposed Transaction, analysts had given stock price projections with a consensus target at $66.60 and a high of $73.  Based on analysts' targets then, a 28.9% premium that Defendants tout for the Merger Consideration equates to a per share consideration of between $85.80 and $94 per share.  Thus, the Merger Consideration is at least between $10.55 and $18.75 per share too low.

72.     Finally, the Merger Consideration fails to adequately value the synergies, profitability, and market position that Solvay will reap from the consummation of the Proposed Transaction.  For example, in connection with the announcement of the Proposed Transaction, on July 29, 2015, Solvay released its own press release, in which Mr. Clamadieu stated:

> The proposed acquisition of Cytec marks a major step change in Solvay's portfolio upgrade. It is a unique opportunity for Solvay to boost its customer offerings in lightweighting with advanced materials in aerospace and automotive, as well as to strengthen its know-how with activities in mining chemicals. Cytec is a high-growth, high-quality group with leading market positions. We are looking forward to working with its excellent teams. This acquisition will create value for our stakeholders and will support our ambition to become a leader in sustainable chemistry. This transaction will lead us to further accelerate our transformation.

73.     The Solvay release further provided:

> Cytec is **among the world leaders** in composite materials and in mining chemicals, recognized by its customers as a **consistently successful** innovator and provider of high-performance and value-added solutions. In the fast- growing composite materials sector, which represents two thirds of its sales, its principal market is primary and secondary structures for aircrafts. It is also developing new technological applications for composites in automotive. Cytec is the leader in tailored specialty chemical formulations to enhance mining separation processes.
>
> Through the acquisition of Cytec, Solvay will gain critical scale and immediate customer intimacy in aerospace.
>
> * * *

> This transaction will underpin Solvay's REBITDA growth momentum, by driving top line growth and margin expansion. Solvay expects annual synergies of more than €100 million, to be substantially realized within three years chiefly through cost savings and excellence. Significant cross-selling opportunities have been identified with Specialty Polymers, both in aerospace and automotive, as well as with Novecare in oil & gas, agrochemicals and electronics. The non-recurring implementation costs are estimated at €75 million. The acquisition of Cytec will be accretive to Adjusted EPS after the first year and to CFROI in the mid-term.

(Emphasis added.)

74.     Further, on July 29, 2015, the Wall Street Journal reported:

> The company said the acquisition would make it one of the leading companies in the market for composite materials for airplanes and should enable it to take advantage of the growing use of such materials in high-end cars. It should also help boost Solvay's business producing chemicals for the mining sector.
>
> "For us, it's making a big entry into aerospace," said Solvay Chief Executive Jean-Pierre Clamadieu.
>
> Cytec produces lightweight composite materials for Airbus's A350 and the Boeing 787, where they help reduce the planes' overall weight and improve fuel efficiency, Mr. Clamadieu said. **Solvay expects annual growth of around 10% for such materials in the aerospace sector**, he added.
>
> Lightweight composites are also used in high-end cars such as Ferraris and Lamborghinis. Mr. Clamadieu said the use of these materials should increase in other high-end cars that are produced in bigger numbers, although growth predictions on that end are more uncertain.
>
> "What we've paid for is really the growth in aerospace," he said.

(Emphasis added.)

75.     Indeed, on August 13, 2015, after the announcement of the Proposed Transaction,

analysts at KeyBanc Capital Markets noted:

> We continue to view [Cytec] as a company with some of the

highest organic growth potential within our specialty chemical coverage universe, with good visibility and an overall attractive portfolio of assets, with the Aerospace Materials franchise likely the most coveted assets in the deal. The Company also possesses attractive long-term potential within the automotive market as a market leader of composite material for high performance automotive.

76.     In short, the Merger Consideration does not adequately value Cytec or the value of Cytec to Solvay.

**E.     The Proposed Transaction Is Marred by Conflicts of Interest**

77.     The insufficient consideration contemplated by the Proposed Transaction should come as little surprise in the light of the flawed and conflicted process that led to the consummation of the Merger Agreement.  Specifically, certain members of the Board will receive lucrative payments and other benefits in connection with the consummation of the Proposed Transaction that common shareholders will not.

78.     For example, in connection with the consummation of the Proposed Transaction, all outstanding, unexercised Cytec stock options and all outstanding, vested Cytec Restricted Stock Units ("RSUs") will be cashed out.  What is more, all restrictions imposed on outstanding, vested shares of Cytec Restricted Stock (including any shares of such Restricted Stock that will vest as of the consummation of the Proposed Transaction) will lapse, and each vested share of Cytec Restricted Stock will be treated in the same manner as a share of Cytec common stock. Meanwhile, all outstanding, unvested shares of Cytec Restricted Stock (that will not vest as of the consummation of the Proposed Transaction) will be cancelled and converted into a right to receive a Deferred Restricted Stock Payment, which will be paid on the applicable vesting dates specified under the applicable Cytec stock plan and the agreements evidencing the related unvested shares of Company Restricted Stock.

79.     Similarly, all outstanding, unvested RSUs (that will not vest as of the consummation of the Proposed Transaction) will be cancelled and converted into a right to receive a Deferred RSU Payment, which will be paid on the applicable vesting dates specified under Cytec's applicable stock plan and the agreements evidencing the related unvested Company RSU.  And all Cytec Deferred Stock Rights will similarly be cancelled and converted into a right to receive a Company Deferred Stock Right Payment.

80.     According to the Proxy, "[u]nder the terms of the Company Stock Plan, vesting and payment of the Deferred RSU Payments and the Deferred Restricted Stock Payments held by a single executive officer would accelerate in the event that, prior to the second anniversary of the effective time of the merger, the employee is terminated by the Company without 'cause' or resigns for 'good reason' (as each such term is defined in the Company Stock Plan)."  Based on these assumptions, the non-employee directors of the Company are expected to reap as much as $4,023,768 in connection with the consummation of the Proposed Transaction from their unvested stock options and unvested RSUs alone.

81.     Based on similar assumptions, Defendant Fleming is expected to receive as much as $5,971,104 in connection with the consummation of the Proposed Transaction (and a qualifying termination of his employment) in cash severance.  In addition, upon the closing of the Proposed Transaction, certain performance conditions for Cytec's executive offer's performance cash awards will be deemed satisfied at maximum levels, although each executive will remain subject to the service-based vesting component of such award through the applicable payment date.  After giving effect to the satisfaction of the performance conditions at maximum levels, the value of the performance cash awards held by Defendant Fleming is expected to be an additional $9,900,000.  In total, according to the Proxy, under certain circumstances, Defendant

Fleming could receive as much as $30,863,516 in golden parachute compensation in connection with the consummation of the Proposed Transaction.

82.     Finally, in connection with their service on the Transaction Committee, Defendant Powell will receive an aggregate fee of $75,000 and Defendants Fernandes and Hoynes will each receive an aggregate fee of $50,000.

**F.     The Individual Defendants Are Impermissibly Locking Up the Merger**

83.     Despite the fact that they failed to conduct any semblance of a full market check prior to signing the Merger Agreement, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to include certain onerous preclusive deal protection devices in the Merger Agreement that together operate to ensure that no competing offers emerge for the Company and that the Proposed Transaction closes.

84.     For example, Section 6.03(a) contains a "no solicitation" provision prohibiting the Company from doing the following: (i) soliciting, initiating or knowingly facilitating any inquiries, offers or the making of any proposal to acquire and/or merge with the Company ("Acquisition Proposal" defined fully at section 1.01), (ii) negotiate with and/or provide information regarding the Company to any entity regarding an Acquisition Proposal, or (iii) withhold, withdraw or modify the Board's recommendation to enter into the Proposed Transaction.

85.     Under Section 6.03(c), the Company must notify Solvay that it received an Acquisition Proposal and provide Solvay in writing with the material terms of said proposal, all within 24 hours. If the Company believes the proposal could lead to a Superior Proposal, the Company may negotiate with the entity making the proposal only so long as the Company concurrently provides Solvay with any nonpublic information provided to the third party. Section

6.03(b).

86.     Further, section 6.03(d) of the Merger Agreement severely limits the Board's ability to recommend any competing bid by providing Solvay four (4) business days after the delivery of the notice of a superior proposal, and a detailed description explaining the Board's reasons for determining that the Acquisition Proposal constitutes a superior Proposal, to negotiate and adjust the terms and conditions of the Merger Agreement so that the competing Acquisition Proposal ceases to be a superior proposal.   Solvay is thus able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, including the identity of the third-party bidder, eliminating any leverage that the Company has in receiving the unsolicited offer, and significantly deterring an alternative offer from coming forward.

87.     Finally, the Merger Agreement at section 11.04(a) provides that Cytec must pay Solvay a termination fee of $140 million if the Company terminates the Merger Agreement to pursue another offer, thereby requiring that any alternate bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer.

88.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.   The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. These deal protection devices are particularly egregious considering the Cytec Board failed to conduct any semblance of an auction process in order to reasonably inform itself of Cytec's actual market value.   After failing to conduct any market

check, defendants wrongfully bound the Company to a Merger Agreement that failed to include a "go-shop" provision.

**G.     The Defendants Are Withholding Material Information from Shareholders**

89.     The Individual Defendants caused Cytec to file the Proxy with the SEC in connection with the Proposed Transaction.   As discussed below and elsewhere herein, the Proxy omits material information that must be disclosed to Cytec' stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

90.     Notably, in connection with the process that culminated in the Proposed Transaction, the Proxy fails to adequately disclose why the Board was unwilling to afford Party D acquiror the time it needed to appropriately conduct due diligence.   The Proxy also fails to disclose the basis for J.P. Morgan's changed belief that Party E would be interested in engaging in the process and how J.P. Morgan came to be in possession of this information other than to cryptically state that J.P. Morgan became aware of the Party E's potential interest during the ordinary course of its regular investment coverage of Party. E.

91.     The Proxy further omits material information with respect to the opinions and analyses of J.P. Morgan.   This omitted information, if disclosed, would significantly alter the total mix of information available to Cytec' stockholders.   In particular, with respect to J.P. Morgan's *Public Trading Multiples* Analysis, the Proxy fails to disclose: (i) the multiples used for each of the selected companies observed by J.P. Morgan, including FV/201E EBITDA and FV/2016E EBITDA; and (ii) whether J.P. Morgan performed any type of benchmarking analysis for Cytec in relation to the selected companies or either of the Defense company group or Service company group. Additionally, the Proxy states that J.P. Morgan noted that the data points of the Hexcel Corporation were the most relevant to this analysis, but fails adequately   to

explain the basis for why and how they are relevant. Moreover, although  the Proxy provides that the Hexcel FV/2015 EBITDA and FV/2016 EBITDA reference range multiples that were applied to the Company's 2015 and 2016 EBITDA estimates were "more heavily weighted"   to derive the multiples reference ranges, the Proxy fails to disclose the degree to which these data pointes weighted and impacted the J.P. Morgan's analysis in comparison to the other selected comparable companies.   For stockholders to make a fully informed decision regarding the Proposed Transaction, Defendants must disclose Hexcel's and the other comparable companies' specific data points  and multiples in order to fully gauge and measure the per share equity value ranges provided by JP Morgan and Defendants in this analysis.

92.     Similarly, with respect to J.P. Morgan's *Selected Transactions Analysis*, the Proxy fails to disclose: (i) the FV/LTM EBITDA multiples for each of the selected transactions observed by J.P. Morgan in its analysis; and (ii) whether J.P. Morgan performed any type of benchmarking analysis for Cytec in relation to the selected transactions. Additionally, the Proxy states that J.P. Morgan noted that the data points of the Albermarle Corporation acquisition of Rockwood Holdings, Inc. (with an FV/LTM EBITDA multiple of 14.7x) and the Company's acquisition of Umeco plc (with an FV/LTM EBITDA multiple of 10.8x) were the most relevant to this analysis, but fails adequately to explain how they are the most relevant. Moreover, although the Proxy provides that  Rockwood and Umeco transaction  FV/LTM EBITDA multiple reference ranges that were applied to the Company's LTM EBITDA estimates were "more heavily weighted" to derive the multiples reference range described in the Proxy, the Proxy fails to disclose the degree to which these data points weighted and impacted J.P. Morgan's analysis in comparison to the other selected transactions..  Furthermore, two of the transactions involving Rockwood Holdings Inc., were sales of specific Rockwood Holdings units

that produced a unique product and the Proxy fails to disclose the basis for selecting these transactions to compare to analyze the Proposed Transaction, which involves the acquisition of the Company's entire operations. For stockholders to make a fully informed decision regarding the Proposed Transaction, Defendants must disclose the specific data points and multiples in order to fully gauge and measure the per share equity value ranges provided by JP Morgan and Defendants in this analysis.

93.     With respect to J.P. Morgan's *Discounted Cash Flow* ("DCF") *Analysis*, the Proxy fails to disclose: (i) the individual inputs and assumptions used for the selection of discount rates of 7.75%-9.0% (including specific inputs and method for determining weighted average cost of capital); (ii) the implied terminal multiples observed; and (iii) the basis for the selection of perpetuity growth rates of 2.5%-3.0%.

94.     Moreover, with respect to the DCF Analysis, although the Proxy discloses that stock-based compensation ("SBC") was treated as a "true economic expense" for purposes of the free cash flow build, the Proxy fails to disclose the rational for treating the Company's SBC as a "true economic expense" and the projected amount of said expenses utilized in determining free cash flows.

95.     The Proxy further fails to disclose the specific services J.P. Morgan has provided to Solvay's affiliates in the last two years and how much compensation was received for services rendered.

96.     The Proxy discloses that the Company's Projections and Extrapolations were finalized in May 2015 and not updated to reflect revised assumptions and guidance for the quarter ended June 30, 2015.  The Proxy fails to disclose the rational for failing to update the Company's Projection and Extrapolations despite the changes underlying the assumptions and

whether the Company and/or J.P. Morgan considered and/or evaluated the Company's current estimates and/or guidance issued in connection with the Company's financial results for the quarter ended June 30, 2015, in approving the Proposed Transaction and/or rendering the fairness opinion.

97.     Furthermore, J.P. Morgan requested that the Company extrapolate projections for fiscal 2020 through 2025 for its industrial materials business and assumptions for J.P. Morgan to use when J.P. Morgan extrapolated projections for these same years for the Company's other business lines and the Company as a whole.  The Proxy fails to disclose the underlying rationale for the above divergent manner for extrapolating the Company's projections from 2020 through 2025.  Moreover, the Proxy must breakout the extrapolated projections for the Company's industrial materials business created by the Company and the specific assumptions that were provided for J.P. Morgan to extrapolate projections for the Company as a whole and its other businesses.   This information is material and necessary for stockholders to weigh the reasonableness of the Company's Forecasts.

98.     J.P. Morgan's engagement letter with the Company was supplemented on July 26, 2015, and backdated to be effective as of March 1, 2015.  In view of the extraordinarily high contingent element in J.P. Morgan's fee agreement (97% of the $28.5 million fee is contingent on closing the Proposed Transaction) as well as other circumstances outlined herein regarding the deficient and conflict-riddled sales process, the Proxy must disclose the rationale and basis for supplementing J.P. Morgan's engagement as well as the substance of the supplemented engagement and how it differed from the original December 22, 2014 engagement.

99.     The Proxy is materially incomplete and misleading because it omits the information identified above.

100. For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT I

**On Behalf of Plaintiff and the Class Against
Cytec and the Individual Defendants for Violations of Section 14(a)
of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder**

101. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

102. Defendants have issued the Proxy with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses performed by J.P. Morgan in support of its fairness opinion, and the background leading up to the Proposed Transaction.

103. In so doing, defendants made untrue statements of fact and omitted state material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

104. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

105.    Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) certain material information regarding the process leading up to the consummation of the Merger Agreement; (ii) key inputs and assumptions underlying J.P. Morgan's financial analyses; and (iii) the projected financial information prepared by Cytec management and relied upon by J.P. Morgan in its financial analyses supporting its fairness opinion.

106.    Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.   The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board and that the Board considered both the financial analyses provided by J.P. Morgan as well as J.P. Morgan's fairness opinion.   The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

107.    The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.   Plaintiff has no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Violations of Section 20(a) of the Securities Exchange Act of 1934**

108.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

109.    The Individual Defendants acted as controlling persons of Cytec within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Cytec, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

110.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

111.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

112.    In addition, as the Proxy sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

113.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

114.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

115.   Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.   Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.   Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company  discloses the material information discussed above which has been omitted from the Proxy;

C.   In the event Defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff and the Class;

        D.      Directing Defendants to account to Plaintiff and the Class for  damages sustained because of the wrongs complained of herein;

        E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

        F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 6, 2015           **FARUQI & FARUQI, LLP**

                               */s/ James R. Banko*
                               James R. Banko (#4518)
                               Derrick B. Farrell (#5747)
                               20 Montchanin Road, Suite 145
                               Wilmington, DE 19807
                               Tel: (302) 482-3182
                               jbanko@faruqilaw.com
                               dfarrell@faruqilaw.com

                               *Attorneys for Plaintiff*

**OF COUNSEL:**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina, Esq.
206 Covington Street
Madisonville, LA 70447
Tel.: (504) 455-1400
Fax: (504) 455-1498
E-mail: Michael.Palestina@ksfcounsel.com

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
369 Lexington Avenue, 10th Fl.
New York, NY10017
Tel.: (212) 983-9330

*Attorneys for Plaintiff*